## JOHN JEFFERY ET AL. v. ELIZABETH HURSH ET AL.

[See 42 Mich. 563; 45 Mich. 59; 49 Mich. 31.]

*Deed and defeasance as mortgage—Power of attorney to sell—Bond to reconvey—Taxing costs.*

1. The character of a deed as security is not destroyed by the fact that no defeasance was given until after the delivery of the deed, provided the transactions were substantially contemporaneous and were manifestly meant to amount to a mortgage.

2. The recital in a bond of defeasance that the obligor will reconvey such interest as he has *now* acquired, establishes the contemporaneous character of the deed and defeasance and cannot be contradicted by parol.

3. A bond of defeasance, being under seal, is an instrument of as high order as the deed which it accompanies.

4. A bond to reconvey is valid as a defeasance even though it covers lands belonging to a third person and included with the grantor's land by virtue of a power of attorney to him to sell them. It would be good at law as to the grantor's land, and in equity as to the third person's, the last not being mortgageable under a power of sale.

5. A power of attorney to sell will not support a mortgage; and if the deed is really intended as security they are conveyed without authority and the grantee cannot maintain ejectment for them.

6. A deed absolute taken in connection with a bond or separate defeasance or agreement, executed at the same time, to reconvey on payment of a stated sum, constitutes a mortgage if the instruments are of the same date or are executed and delivered at the same time and as one transaction. When this is the case it is a conclusion of law that they constitute a legal mortgage.

7. Costs are not of right at common law, but only by statute. And the statute does not cover proceedings that were complete in themselves before its adoption.

8. Costs, that by order of court or under some statute have been paid during the progress of the case, cannot be recovered back nor taxed on the final disposition of the case.

9. The party who on appeal recovers final judgment in ejectment is entitled not only to his costs of the appeal but to such costs as are taxable of all previous trials. whether decided for or against him.

10. Where an appellate court orders a new trial in ejectment the costs are in its discretion; but all that are not disposed of by its special order will abide the final result and will be taxable then.

11. An order for reversal and new trial with costs of both courts means the costs of that hearing in the appellate court and of the particular trial below wherein the judgment was reversed. It can not, against objection, cover all previous trials below if there have been several.

12. An affidavit for the taxation of witness fees as costs must state the residences of the witnesses as well as their names, the number of miles they have traveled and the number of days they have necessarily been in attendance.

13. In taxing witness fees it is not to be assumed, without some showing, that unsworn witnesses were not properly summoned, if the affida-

vit to the bill of costs states that they were deemed necessary and were called in good faith.

14. Witness fees and sheriff's fees for subpœnaing witnesses cannot be taxed as costs unless the affidavit for taxation shows that the sums claimed have been disbursed by the party claiming taxation or that the service has been performed for him.

15. Continuance fees are not taxable as costs without some showing that the case was continued on motion of the losing party or that it was not reached during the term.

16. Defects in a bill of costs must be supplied, if at all, while the matter is before the taxing officer; no amendment can ordinarily be allowed on appeal from his action. The proper course would be to withdraw the bill and make a new application, or to ask for a postponement and supply the defects by the adjourned day.

Error to Bay. (Green, J.)   Oct. 7–8.—Oct. 28.

EJECTMENT.   Defendants bring error.   Reversed.

*Brown & Leaton, Fancher & Dodds Bros., A. McDonell,* and *John Atkinson* for appellants. A conveyance absolute on its face with an instrument of even date to reconvey on repayment of the consideration with interest is prima facie a mortgage: Jones on Mortgages, § 244; *Taylor v. Weld* 5 Mass. 109; *Bailey v. Bayley* 5 Gray 505; *Murphy v. Calley* 1 Allen 107; *Lane v. Shears* 1 Wend. 433; *Enos v. Sutherland* 11 Mich. 539; *Roach v. Cosine* 9 Wend. 227.

*Spaulding & Cranson* and *Hatch & Cooley* for appellees.

CHAMPLIN, J.   Plaintiffs, as heirs-at-law of John Jeffery, deceased, brought ejectment to recover possession of the west half of the northeast quarter of section 22, township 14 north, range 4 east, in Isabella county. They claim title in fee. On the 10th day of March, 1856, John M. Hursh, now deceased, acquired the title in fee-simple to the land in question by patent from the United States, and some time afterwards gave a mortgage thereon to one Ganson, and another to John Jeffery. At this time the defendant Elizabeth Hursh, was the wife of John Hursh, the mortgagor, and joined with him in the execution of the mortgages. Afterwards, and on the 29th day of March, 1871, John M. Hursh by warranty deed, conveyed the land to Wesley Win-

ters, and he on the same day conveyed by deed the land to the defendant Elizabeth Hursh. April 9th 1872, Elizabeth Hursh executed a power of attorney to her husband, John M. Hursh, by which she empowered him " to sell and convey all lands that I am possessed of in the counties of Clare and Isabella, to receive payments for the same at any price or prices that to my said attorney may seem meet and just, and to execute and deliver such deed or deeds of conveyance in my name as may be necessary to convey the title to such land in fee." On the 23d day of November, 1872, John M. Hursh executed a warranty deed of the land in question together with about five hundred and sixty acres of lands belonging to himself, to John Jeffery, the plaintiff's ancestor. In this deed he purported to act for himself personally and as the attorney in fact of Elizabeth Hursh. It contains a covenant that the premises are free from all incumbrances, and also of warranty against all lawful claims.

The defendants claim that this instrument was not intended as an absolute deed, but that it was either a mortgage or a conditional sale; and in either case is void as to the land of Elizabeth Hursh, for the reason that the power of attorney from her to John M. Hursh did not authorize him to make either a mortgage or conditional sale of her land. The evidence adduced in support of defendant's claim consisted (1st) of a bond bearing the same date as the deed, executed by Jeffery to John M. Hursh, conditioned that he, Jeffery, on the receipt of $3514.46, being the same amount as the consideration named in the deed, with interest thereon at the rate of ten per cent. from that date, to be paid on or before one year to him by said Hursh, would make, execute and deliver to the said John M. Hursh, his heirs or assigns, or to whomsoever might be named by said Hursh, " a good and sufficient deed of conveyance of such interest as I now have acquired of said Hursh, of the following described lands situated in Isabella county and State of Michigan." [Here follows a description of the land in question, and a large number of other descriptions, containing over five hundred acres in all, and being the same lands described in the deed and no others.]

(2d.) Of the testimony of witnesses as to what occurred at the time the papers were executed, and the admission of Jeffery; and (3d) of the fact that Mrs. Hursh had always remained in the possession of the land in question, claiming it as her own and paying the taxes thereon, and that Jeffery never interfered with the possession of defendant Hursh, and never sought in any way to acquire possession thereof.

John M. Hursh and John Jeffery had both died before this suit was commenced. The only living witness who has testified to what occurred at the time the papers were executed is William E. Winton. He was the attorney of John Jeffery in his life-time, and after his decease he was the attorney of Mrs. Jeffery, who was appointed administratrix of the estate of John Jeffery, and who was also guardian of the plaintiffs in this suit. He had assisted in one of the trials of this case at the circuit and addressed the jury on behalf of the plaintiffs. He was judge of probate of Gratiot county, in which the estate of John Jeffery was administered, and was exercising that office at the time the papers in controversy were drawn. John Jeffery died about a year and a half after the deed and bond were executed. After Mrs. Jeffery was appointed administratrix, Mr. Winton, acting as the judge of probate and her legal adviser, at a time when the occurrence was comparatively recent, advised Mrs. Jeffery that the deed in question was not in fact an absolute deed, but a mortgage, and under his advice she treated it as a mortgage, and sold and assigned it as such to one Scriven who brought a suit to foreclose it as a mortgage. She also treated it as a mortgage security in her account of the estate before the probate court of which Winton was judge. After an interval of twelve years from the execution of the deed and mortgage in his presence, he testifies as to what occurred on that occasion as follows :

"On the 23d day of November, 1872, Mr. Jeffery, in company with John M. Hursh, came into the probate office, where I was alone. After the introduction of Mr. Hursh, Mr. Jeffery said that Mr. Hursh had come to sell his wife's farm, with a power of attorney, and wanted me to examine the power of attorney and see if it was sufficient to

vest him with such power. I examined it, and told Mr. Jeffery that I thought it was sufficient. Then Mr. Jeffery went on and made a computation of the amount that was due him on the mortgage, and perhaps some other papers. My mind is not clear enough now to remember how many papers he had, but he had a mortgage, and I can recollect some notes; but whether there were any more notes than were secured by the mortgage I cannot state positively, and the amount of a mortgage that some proceedings had been taken to foreclose that was a lien on this same land,—this land in controversy. Having ascertained the amount that was due Mr. Jeffery, and also on the other mortgage, Mr. Hursh mentioned a certain amount of money over and above. Mr. Jeffery says to Mr. Hursh : ' That eighty is not worth that amount.' The amount he wanted, together with this, amounted to over three thousand dollars. If my recollection serves me right, he said it was not worth that money.

*Question.* Who did ?

*Answer.* Mr. Jeffery. Mr. Hursh says, ' I have some other land that I will put in, together with the eighty in controversy, that will satisfy you for the amount of money I want.' Mr. Jeffery says: ' These are Indian lands about which there is considerable question nowadays about their title. I don't consider them of much value.' Mr. Hursh says, ' I will put in enough so I think you will feel satisfied ; ' and he put in the amount that the deed describes.

*Q.* Did Mr. Hursh make any remark about the title in that connection ?

*A.* He said there was some question about it; but he thought perhaps some of them might be good. After he put in the amount of land he spoke of, it seemed to meet the minds of both parties. I then drew the deed, describing the lands as set forth in the deed.

*Q.* [Handing the witness the instrument from Hursh and wife to Jeffery.] Is that the deed you drew at that time ?

*A.* That deed is in my handwriting. I think that is the identical deed. I drew the deed and counted out the money. Mr. Jeffery laid down the money to see if it was correct. I counted out the money for Mr. Hursh, after delivering the deed, and Mr. Hursh executed it in the manner in which it shows here for itself. I would not from memory know who was the other witness unless I saw it on here. He was a man that was about the court house; he was probably called in to do it, for I don't remember of his being there, but he signed that.

*Q.* What was the amount of the claims Jeffery had against Mr. Hursh, as near as you can recollect?

*A.* It is a matter of recollection. I have the impression that the amount of the claim run up somewheres perhaps to $1800 ; might go over and might fall short. That included both mortgages."

The witness further testified that the amount of money named in the consideration of the deed was the exact amount of the Ganson mortgage, the mortgage due Jeffery, and the money he got over and above those mortgages at the time. He also testified as follows :

*Question.* After you had drawn the deed, and up to the time of the drawing of the deed, was there anything said about a contract or bond back?

*Answer.* No, sir.

*Q.* Was there anything said about it till after the execution and delivery of the deed?

*A.* No, sir.

*Q.* Was there anything said about it until after the payment of the money by Jeffery to him?

*A.* No, sir.

*Q.* State just what next occurred after the money was paid and the deed delivered.

*A.* I think after the deed was drawn and the money was delivered, I says, "I suppose this is ready for delivering," and shoved the deed to Mr. Jeffery and the money to Mr. Hursh, which he took, and Mr. Jeffery the deed. Then I turned around about my own business, while they visited in regard to Mr. Hursh's early settlement in Isabella county, and the hard times, and on they talked about that for a certain time, but how long I can't tell, maybe five minutes and maybe half an hour; just what time was consumed I can't recollect, but during that visit Mr. Jeffery says : "Mr. Hursh, if you will pay me that amount of money within one year (the amount of the consideration), with ten per cent. interest, I will deed this land to you." I says then, "If you want to do that I will put that in writing." Mr. Hursh made no reply. Mr. Jeffery says : "Very well, I will do that." I at once, with no further suggestion, drew that writing, whatever it is.

The witness testifies that he then, without further directions, drew up the bond from Jeffery to Hursh, and Jeffery

signed it, and after it was signed he, witness, either handed it to Hursh or to Jeffery and he to Hursh, who took it and carried it away. On further examination by defendants' counsel, the following testimony was elicited:

*Question.* Was there anything said about possession at the time?

*Answer.* I don't think there was.

*Q.* When did you come to understand it as a mortgage?

*A.* I understood it at the time.

*Q.* Did you get any further information on the subject by the time you drew the mortgage?

*A.* No, sir.

*Q.* You continue to be the attorney for Mr. Jeffery and his estate?

*A.* Yes, sir.

*Q.* When you drew the assignment to Scriven, you drew it as an assignment of a mortgage?

*A.* Yes, sir.

*Q.* You had no additional information?

*A.* No, sir.

*Q.* You drew it of your own knowledge of the first transaction?

*A.* Yes, sir.

On cross-examination he testified that he was induced to think the transaction was a mortgage, because he knew there was a paper given back; and without looking it up to see what the force of defeasance was, it occurred to him that a paper given back in that shape was a defeasance. That about four years afterwards the thought crossed his mind that the paper given back did not amount to a defeasance, and upon examination of the law, he became satisfied that it did not.

From this testimony it is claimed, on the part of the plaintiff, that the bond executed by Jeffery to Hursh cannot operate as a defeasance, for two reasons: (1st) Because the giving of the bond was subsequent and independent of the execution of the deed; and (2d) Because, so far as the lands in dispute are concerned, the bond claimed to be a defeasance was given, not to the grantor of the deed, but to John M. Hursh, a third person.

The first ground is untenable. The deed and bond were cotemporaneous, and constituted one entire transaction ; and as such must be construed together as one instrument. An interval of five minutes or half an hour is not of itself sufficient to make them independent transactions. It is a question of intent whether the deed in question was in fact a mortgage, and such intent is to be gathered from the instruments executed and from the facts and circumstances attending and surrounding the transaction, as well as from all other testimony bearing upon the question. As already remarked, these instruments bear the same date and embrace the same subject-matter. The land assumed to be conveyed absolutely by deed is contained in the bond agreeing to convey to Hursh. Taken together they contain strong intrinsic evidence of being cotemporaneous and parts of the same transaction; and exclude the idea that they are two independent and separate transactions. The language of the bond is that upon receipt of $3514.46, to be paid by Hursh, he, Jeffery, will make, execute, and deliver to Hursh a " good and sufficient deed of conveyance of such interest *as I now have acquired* of said Hursh of the following described lands," etc. The proper meaning of the word " now," as used in the above sentence which I have italicized, is " at the present time ;" and both instruments bearing the same date, the language used stamps them as one transaction, and parol evidence would not be admissible to vary or contradict the writing.

There is no evidence in the case that contradicts the fact expressed in the bond that the two instruments are simultaneous. According to Winton's testimony one immediately followed the other in proper order. The bond was of as high order as the deed. It was under seal and executed in the presence of the same witnesses who witnessed the execution of the deed. Mr. Winton states that he does not know what talk or arrangement had been made by Jeffery and Hursh before they came to his office. Evidently the terms of their agreement had been arranged before going to Winton to have the papers drawn, as scarcely any negotiation was

had in his hearing. It appears that Hursh had staid the night previous at Mr. Jeffery's house, which lends probability to the conclusion that their bargain was arranged there. If not, how does it appear that Jeffery knew all about the nature of the title to the additional lands which Hursh proposed to satisfy him with for the amount of money wanted? Nothing was said by Hursh in Winton's presence about his other lands, or the nature of his title thereto, and yet when he proposed to put in other lands, Mr. Jeffery said at once, "These are Indian lands," etc.

The second ground is equally untenable. With the exception of the eighty acres belonging to Mrs. Hursh, the lands conveyed by the deed belonged to John M. Hursh, and these, as before stated, amounted to over five hundred acres. If the deed was intended as a security, there can be no doubt that as to these lands, the bond to reconvey given at the same time would constitute a defeasance, and the instruments together would constitute a mortgage of the lands belonging to Hursh. The grantor of these lands would be the party to whom the reconveyance was to be made, and within all the decisions, the bond, so far as it embraced the lands conveyed by Mr. Hursh, would be a defeasance. Can it be that, by embracing in the same deed land belonging to Mrs. Hursh and taking the bond to reconvey all of the land to him, the instrument is deprived of its character as a defeasance. I think not. It would still be a defeasance at law as to the lands of Mr. Hursh, and also in equity as to the land of Mrs. Hursh. 1 Jones on Mortgages § 241, and cases cited in note 3. Nor does this view militate against the opinion expressed by this Court in 42 Mich. 563. The record upon which that decision was rendered did not disclose the fact that any of the land embraced in the deed belonged to John M. Hursh. So far as appeared, the lands conveyed were the lands of Mrs. Hursh, and the bond, as disclosed by that record, bound Jeffery to convey to Mr. Hursh. It was claimed that under such facts the bond operated as a defeasance; but this Court held that under such circumstances the bond, running to the husband and attorney-in-fact of the grantor, was not a defeas-

ance, and that parol evidence was necessary to stamp the arrangement as a mortgage transaction.

Here the case made by the proofs is quite different, and leads to a different conclusion. The undisputed testimony shows that Hursh did not intend to make an absolute sale, either of his own or his wife's land. His offer was to convey to Jeffery his wife's land to pay the mortgage debts of himself to Ganson and to Jeffery, and to obtain from Jeffery a definite sum of money besides. Aside from the deed, there is no evidence whatever that it was intended to be an absolute sale. The testimony of Winton as to what transpired in his presence does not tend to prove that an absolute sale was intended, but that it was conveyed as a security for the indebtedness of Hursh, and for money borrowed at that time. He states that Hursh mentioned a certain amount of money, over and above the mortgages, that he wanted, and that Mr. Jeffery says, " That eighty is not worth that amount; " and Mr. Hursh said, " Mr. Jeffery, I have some other land that I will put in, together with the eighty in controversy, that will satisfy you for the amount of money I want." Mr. Jeffery says: " These are Indian lands, about which there is considerable question nowadays about their title. I don't consider them of much value." Mr. Hursh says, "I will put in enough so I think you will feel satisfied; " and the witness says he put in the amount that the deed describes. This is not the language which would be used upon a purchase and sale of over five hundred acres of land. It is inconsistent with such a transaction, but is consistent with a mortgage security in which the mortgagor puts in security until the lender feels satisfied. The question is put at rest when, at the same time, the lender executes an agreement to reconvey the premises upon repayment of the exact amount loaned.

But the evidence that the transaction was a mortgage does not rest here. Joel Drake testified that, a short time before Mr. Jeffery died, in a conversation with witness he told him that he had fixed up his matters with John M. Hursh; that he had taken a deed as security for the amount Hursh owed him; that witness remarked that was a queer way to take a

deed and intend it as a mortgage; that Mr. Jeffery said he thought it was all right; that his attorney Mr. Winton had done the business for him, and he thought it would be all right. In addition to this, Mrs. Hursh remained in possession of the land, and John M. Hursh paid the taxes thereon for the years 1872 and 1873, and defendants' counsel offered, and should have been allowed, to prove that he paid the taxes for 1874 and 1875. It must be remembered also that Mr. Winton, at the time the papers were drawn, deriving his impressions from what occurred at the time, understood the transaction to be a mortgage. That the deed was at first recorded in the book of deeds is of no particular significance. There is no evidence that Mr. Jeffery gave any instruction to the register to record it in the book of deeds, and it was the duty of the register to so record it, unless instructed to the contrary. The fact being established that the deed in question was a mortgage, it follows that Mrs. Hursh's lands were conveyed without authority. The power of attorney only conferred upon Mr. Hursh authority to sell, and it did not authorize him to mortgage her land. The facts proved constituted a complete defense against plaintiffs' action.

It is now settled, as well as any principle of law can be, that an absolute deed, with a bond or separate defeasance or agreement executed at the same time, to reconvey the estate upon payment of a certain sum of money, constitute a mortgage, if the instruments are of the same date, or are executed and delivered at the same time, and as one transaction; and when this is the case, it is a conclusion of law that they constitute a legal mortgage. *Wilson v. Shoenberger* 31 Penn. St. 295; *Reitenbaugh v. Ludwick* id. 131.

It was the duty of the court so to declare the law in this case, and he should have directed a verdict for the defendant in accordance with their first request to charge. As this disposes of the case upon its merits, the other errors alleged need not be noticed. It appears plain to us that a new trial will be of no avail to the plaintiff, yet the statute confers upon him the right of a retrial if he desires one, and we therefore

Reverse the judgment, and order a new trial. The defendants are entitled to a judgment here for the costs of both courts.

The other Justices concurred.

Motion for re-taxation of costs. Submitted February 2, 1886. Granted February 19.

*Spaulding & Cranson* for the motion.

*Dodds Brothers* against.

CHAMPLIN, J. Motion for re-taxation of costs. Suit in ejectment was brought in the circuit court for the county of Isabella, which resulted at a trial had at the May term, 1879, in a verdict and judgment for defendant. Plaintiff brought error, and the judgment was reversed by this Court with costs, and a new trial granted. The case was tried again at the May term, 1880, when the defendant again recovered, and upon writ of error to this Court was again reversed and a new trial ordered. Again the cause was tried at the May term of the Isabella circuit court, and judgment rendered in favor of plaintiff, which judgment was reversed by this Court. In October, 1883, a change of venue was taken to the circuit court for the county of Bay, where a trial was had and judgment rendered in favor of the plaintiff, which was again reversed by this Court. On a new trial the plaintiff again had judgment, which was brought to this Court and reversed at the October term, 1885, with costs of both courts and a new trial granted. The defendant has presented and had taxed a bill of costs, which includes the taxable costs of each of the trials in the court below, as well as the costs of this Court for the October term at which she prevailed. It is objected to on the ground that the defendant is not entitled to the costs of those trials which resulted in judgments in her favor and which were reversed by this Court.

The right to recover costs is conferred by the statute and

did not exist at common law. It is to the statute therefore that we must look for the authority to recover costs in any given case. The statute provides that the defendant in actions of ejectment shall recover his costs upon a judgment rendered in his favor, if after appearance of the defendant such plaintiff be nonsuited, discontinue his suit, be *non pros'd* or judgment pass against him on verdict, demurrer or otherwise. How. Stat. §§ 8964, 8967. Also, if upon writ of error the judgment be reversed the plaintiff in error shall recover costs, unless in such judgment a new trial be ordered, in which case the costs on reversal shall be in the discretion of the court; and if a judgment [be] reversed in part and affirmed in part, costs shall be awarded to either party in the discretion of the court; and if then upon such writ the judgment be affirmed, the defendant in error shall recover costs. How. Stat. §§ 8978, 8979. The proper construction to be given to these statutes is that the party who finally prevails in the suit and recovers final judgment, is entitled to recover his costs; and in case there has been more than one trial, the party who finally prevails is entitled to recover his taxable costs of each trial. Costs, however, which are paid under an order of the court during the progress of a cause, or in compliance with any statutory requirement, cannot be recovered back or taxed on the final disposition of the cause. When cases are brought to this Court by writ of error, the plaintiff in error, in case final judgment is entered here, is entitled to tax his costs in this Court of the court below, including therein all the costs which he is entitled to recover. If the judgment entered here is not final, if liberty be given to amend, or a new trial be granted, or if in any other form the original action is still to go on, the costs on reversal are in the discretion of this Court, and all costs not disposed of by the special order or direction of this Court must abide the event of the suit, and be taxable to the party recovering final judgment.

In this case a new trial was ordered on reversal, and the plaintiff in error was awarded the costs of both courts. This order included the costs of this Court and of the trial in the

court below whose judgment was reversed. The costs of the former trials must abide the event of the suit. It follows that the costs of the former trials cannot be taxed in this Court in this action, if objection be made by the plaintiff.

Another objection is made to the taxation of mileage of the witnesses because there is no proof of the place of residence of each witness. The statute allows fees to witnesses in civil actions, for traveling, at the rate of ten cents a mile in coming to the place of attendance, to be estimated from the residence of such witness if within this State, or from the boundary line of the State which such witness passed in coming, if his residence be out of the State. How. Stat. § 9016. Another section of the statute provides that "When there shall be charges in a bill of costs for the attendance of any witness, * * * such charges for witnesses shall not be taxed without an affidavit stating the distance they respectively traveled and the days they actually attended. How. Stat. § 9002. The bill of costs in this case contained a statement of the name of each witness, the number of days and the miles traveled, but did not state the residence of the witness; and the affidavit stated "that the witnesses above named were in good faith made to attend, and were deemed material and necessary, and they respectively traveled the number of miles, and actually attended the number of days specified."

That portion of section 9002 above cited is the same as the Revised Statutes of New York (2 Rev. Stat. 653, § 7), which was construed by Mr. Justice Bronson in the case of *Ehle v. Bingham* 4 Hill 595. He says: "An affidavit of travel and attendance of witnesses is defective unless it state the name and place of residence of each witness, the distance traveled by him, and the number of days he actually attended. For the purpose of satisfying this requirement, and detecting any false swearing, the affidavit should state the name and place of residence of each witness, the distance he had to travel to reach court, and the number of days that he actually attended as a witness in the particular cause. No other rule will effectually guard against overcharges." Our practice is

essentially the same as that which prevailed in the state of New York before the adoption of the Code in that state, and the authors upon that practice as it then existed are regarded as authority in our courts in matters where the practice is the same. Burrill and Graham lay down the same requisites in the affidavit to tax the costs and fees of witnesses as stated by Mr. Justice Bronson. We think that taking both sections of the statute together relating to the fees of witnesses, and taxing costs for their attendance, the affidavit should show the residence of each witness as well as the other requisites. We are aware that the practice in this State has not been uniform in this respect, and therefore we shall not strike out these items for witness fees on the objection made, but permit another affidavit to be filed showing the residence of each witness.

Elizabeth Hursh, the defendant, is included in the list of defendant's witnesses for the trial at the May term, 1879, and a charge is made of seven days' attendance and eighteen miles' travel, amounting to $8.80. The statute provides that when "the bill of costs shall contain an item or items for the attendance and travel of the party himself as a witness, such item or items shall be taxed upon affidavit that the party was in attendance upon the court for the time charged for the purpose of being sworn as a witness, and not to assist in the management of the cause, and the travel was for the purpose of giving his evidence." The affidavit upon which the above item was taxed states: "And that the defendant, Elizabeth Hursh, attended as a witness and for that purpose only, and not to assist in the management of the cause." She was not sworn, and the affidavit does not state that "the travel was for the purpose of giving her evidence," which the statute requires; but the trial was had in 1879, and the statute permitting parties to tax the cost of attending the trial as witnesses was not enacted until 1881. This item must be rejected.

Another witness was not sworn at the trial which occurred in May, 1879, and two others were not sworn at the September term, 1884. The affidavit states that they were in good

faith made to attend, and that they were deemed material and necessary. The bill of costs does not disclose such a large number of witnesses as leads us to infer that witnesses were unnecessarily accumulated, and in the absence of any counter-showing, we cannot say they were not deemed necessary, and caused to attend in good faith. *Gilbert v. Kennedy* 22 Mich. 19.

A witness had been subpœnaed and his fees paid by plaintiff. He was in attendance in pursuance of such subpœna, and was called as a witness, and sworn on behalf of defendant. The bill contains an item of three days' attendance and seventy miles' travel for this witness, amounting to $10. This item was improperly taxed, and is rejected. There was no showing that he was subpœnaed and his fees paid by defendant.

Objection is made to the following item: "Sheriff Packard's fees for serving subpœnas in Isabella county, $7; deputy-sheriff Whitney's fees for serving subpœnas on witnesses in Gratiot county, $10;"—included in the bill of costs for the March term, 1874; and "Sheriff Packard's fees for serving subpœnas on witnesses, $9.75," included in the bill for September term, 1884. These items were not claimed as disbursements, and there was nothing before the taxing officer showing that the services had been performed. The sheriff had made no return. Before such fees can be taxed there must be some evidence that the services were rendered. These items must be disallowed.

Among the items taxed was one amounting to $152.50, purporting to be for costs on continuance for the March term, 1884. The affidavit of O. L. Spaulding shows that there was no stipulation for continuance, and the certificate of the clerk of Bay county shows that there is no journal entry continuing the cause at the March term. Without some showing that the cause was properly upon the calendar of the court for trial at that term, there is no foundation laid for taxing the costs of a continuance. Before such costs can be taxed it must be made to appear that the cause stood for trial at that term, and was either continued on application

of the plaintiff or was not reached before final adjournment.

We have now passed upon all the objections made to the taxation of the bills of costs presented to and taxed by the clerk. As before stated, only the costs in this Court upon the reversal at the October term, 1885, and the costs of the last trial in the court below, can be taxed in this Court, unless by consent. The matter will be referred back to the clerk of this Court, with leave for defendants to amend their affidavit or file new ones showing the residence of their witnesses, and to supply such other defects in proof of the items which it is proper for the clerk of this Court to tax, and new notice of taxation and copies of affidavits must be served upon the attorneys for the plaintiffs. This action permitting defects to be supplied, however, is not to be taken as a precedent in practice. Ordinarily, when objections are made and defects pointed out, such as is done in this case, it is the duty of the party applying to tax the bill, if he wishes to remedy the defects, either to apply for a postponement and supply the defects by the adjourned day, or withdraw his bill and make a new application; and if he fails or neglects to do so, it will be too late after taxation to do so, and the items will stand rejected. But as the practice hitherto has been somewhat uncertain, we deem it just to make an exception in this case.

The other Justices concurred.